NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0507n.06

No. 17-1907

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NIKITA T. SMITH; KEVIN D. THOMAS, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CITY OF DETROIT, MICHIGAN, et al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**FILED**
Oct 15, 2018
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** In this § 1983 case, Detroit Police Officers obtained a search warrant based on information that marijuana was being sold from a home where Plaintiffs-Appellants Nikita Smith and Kevin Thomas ("Plaintiffs") lived. While executing the warrant, the Officers shot and killed Plaintiffs' three unlicensed dogs. The district court granted summary judgment in favor of Defendants because it found that Plaintiffs forfeited any property interest in the dogs by failing to license them. We disagree, and **REVERSE** in part.

I.

Plaintiffs began occupying an abandoned house in Detroit, Michigan in November 2015. They brought three dogs with them to the home: "Debo," a nine-year-old Pit Bull; "Smoke," a seven-year-old Rottweiler; and "Mama," a seventeen-month-old pregnant Pit Bull. None of the dogs were licensed under the City of Detroit Code § 6-2-1.

In January 2016, a neighbor called the narcotics hot line and reported that the occupants were selling marijuana from the house. On January 11, 2016, Defendant-Appellee Officer

Wawrzyniak and a confidential informant conducted a $10.00 controlled buy at the house. In response to Wawrzyniak's question whether there were any dogs in the residence, the informant replied that he "thought he heard a small dog." (R. 25-4 at PID 478.)

Officers obtained a search warrant and Defendant-Appellees, Detroit Police Officers Gaines, Howell, Morrison, Paul, Wawrzyniak, and Sergeant Harris (collectively "the Officers"), went to the residence to execute it. Roughly fifteen minutes before executing the search, the Officers conducted a briefing, during which Wawrzyniak discussed the information he had regarding the layout of the home, the controlled purchase, and the seller, and mentioned that a dog might be inside the residence.

After concluding the briefing, the Officers gathered on the front porch, knocked, and announced their presence and that they had a search warrant. The Officers did not hear anyone respond inside the home. Before breaching the door with a battering ram, the Officers heard dogs barking. According to Gaines, the police did not change their plans after they became aware of the dogs because they were concerned that an occupant would flush narcotics down the drain if they delayed conducting the search. Smith—who was the only Plaintiff present at the time— contends that when she saw the Officers and the dogs started barking, she called out that she was going to secure the dogs. Smith then put the two Pit Bulls (Debo and Mama) in the basement and, because the basement did not have a door, Smith pushed a stove against the doorway in front of the stairs leading down to the basement. The Rottweiler (Smoke) was already in the bathroom behind a closed door.

After attempting to secure the dogs, Smith walked into the living room, where the Officers were standing with their guns drawn. Debo had apparently escaped from the basement:

> The first thing after I put the dogs up, my dog Debo pushed the door
> – pushed the stove, and next thing you know he is standing beside

> me . . . . He got out the – the barricade, came to where I was at, stood there beside me, as the police officer was standing there with the guns already pointed, so as soon as that happened they – he shot him right next to me, right by my feet.

(R. 25-1 at PID 407.) Smith's recollection is that Debo was sitting or standing next to her when Morrison shot at least three or four rounds, hitting Debo in the body and the head.

The Officers, conversely, recall a "vicious" grey pit bull "immediately charging, trying to come out and attack us." (R. 25-3 at PID 463.) Morrison testified that he fired one shotgun shot at Debo's legs, and then allowed Smith to "put the dog up." (R. 25-2 at PID 432.) Morrison recalls that Debo "came charging back through the dining room back towards the living room again" after Smith apparently lost control of the dog. (*Id.*) Gaines then shot Debo seven times. Debo died next to Smith in the doorway to the living room.

The Officers then began to clear the home. After hearing barking from the bathroom, Morrison cracked the door open to check if Thomas or anyone else was inside with the dog. Morrison did not see a person, but saw Smoke, whom Morrison described as a "vicious" dog that was "growling and exhibiting a posture or other indicators that a[n] imminent attack is probably going to occur." (*Id.* at PID 437.) Morrison and Gaines testified that after opening the bathroom door, Smoke became trapped between the door and the bathroom vanity. The Officers say they shot Smoke through the door before he could break free. Later, Paul entered the bathroom, observed that Smoke had been mortally wounded, and shot Smoke in the head "to put it out of its misery." (R. 25-12 at PID 809.)

Smith disputes the Officers' accounts. According to Smith, Smoke was not attacking or expressing aggression toward the police; nor did Smoke get his head through the door. Smith testified that the Officers discussed whether or not to shoot the dog in the bathroom before shooting

through the door. Smith also testified that after the shooting, she heard Gaines say, "Did you see that? I got that one good." (R. 25-1 at PID 413.)

The Officers continued to clear the home. Wawrzyniak and Paul were at the top of the basement staircase and testified that the final dog, Mama, "started to charge up the stairs." (R. 25-4 at PID 486.) Paul stated that because Mama charged up the stairs and showed her teeth, he shot the dog four or five times with his shotgun. Mama was found dead in the basement.

Smith saw the Officers descend into the basement, but had been placed in handcuffs in the living room. As a result, Smith did not see what happened and did not see the Officers shoot Mama.

After the search concluded, the Officers called Detroit Animal Control, and they responded, and removed and disposed of the dogs' bodies. Officers found 25.8 grams of marijuana in the residence. Smith was arrested and charged with a misdemeanor violation of Detroit's marijuana law, which was dismissed when the Officers failed to appear in court to testify. Internal investigations into the incident concluded the shootings were justified.

II.

Plaintiffs filed suit under 42 U.S.C. § 1983, asserting claims against the Officers for illegal seizure of the dogs in violation of the Fourth Amendment, *Monell*[1] claims against the City of Detroit, and state-law claims for conversion and intentional infliction of emotional distress.

All Defendants moved for summary judgment, which the district court granted after finding that Plaintiffs did not have a legitimate possessory interest in their dogs because they were unlicensed:

> Thomas and Smith committed a misdemeanor violation of both the
> Michigan Dog Law of 1919 and the Detroit City Code by not licensing
> their dogs. Consequently, the dogs fit within the definition of

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

> contraband, and Plaintiffs do not enjoy a legitimate possessory interest
> protected by the Fourth Amendment under the particular facts of this
> case. . . .

(R. 27 at PID 947–48.)

Because this is "an issue of first impression," the district court also conducted a qualified immunity analysis and held that even if Smith and Thomas had a possessory interest in the dogs, the Officers' plan was reasonable because they only had notice of one "small dog,"[2] and the Officers' actions were reasonable when they shot Mama. However, because Defendants-Appellees conceded material issues of fact remained regarding whether two of the dogs posed an imminent threat, the district court held that if Smith and Thomas had a legitimate possessory interest, the Officer who initially shot Debo (Morrison) and the Officers who shot Smoke behind the bathroom door (Morrison and Gaines) were not entitled to summary judgment.[3]

Smith and Thomas timely appealed.

### III.

We review a district court's grant of summary judgment de novo. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016) (citing *Mullins v. Cyranek*, 805 F.3d 760, 764 (6th Cir. 2015)). We "must assume the truth of the non-moving party's evidence and construe all

---

[2] Wawrzyniak described in his deposition the plans the officers had in case they were confronted by dogs at the residence:

> [T]he first two guys . . . walks [sic] through that door with the long guns and if
> they can kick [the dogs] out of the way and they proceed to run to a corner, fine,
> but if they come back to attack then you just have to eliminate that threat so no
> one gets bit.

(R. 25-4 at PID 478–79.) When asked whether the only two options for dealing with dogs were to "either shoot or kick away," Wawrzyniak responded "Absolutely," and explained that the police "have no other tool to deal with a dog." (*Id.* at PID 479.) Wawrzyniak later acknowledged that the Officers could call Detroit Animal Control to remove the dogs. We agree with the district court that the plan was not unreasonable given that the Officers only had information suggesting the possible presence of "a small dog."

[3] The district court also granted summary judgment on the *Monell* claims against the city and on the state-law IIED claim. Again due to Defendants-Appellees concessions, the district court found material issues of fact precluded summary judgment against Officers Morrison and Gaines on Plaintiffs' state-law conversion claim. These rulings are not before us.

inferences from that evidence in the light most favorable to the non-moving party." *Id.* (quoting

*Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)).

Government officials are immune from civil liability under 42 U.S.C. § 1983, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation mark omitted). To determine whether a government official is entitled to qualified immunity, we analyze (a) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (b) whether that constitutional right was clearly established such that a "reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation and internal quotation marks omitted), *overruled on other grounds by Pearson*, 555 U.S. at 229.

Defendants concede that material issues of fact remain as to whether the seizure of two of the dogs—Debo and Smoke—was justified by exigent circumstances. Defendants further concede that a person has a Fourth Amendment right to not have his or her lawfully possessed dog unreasonably seized and that this right was clearly established in 2013. (R. 27 at PID 950 (citing *Brown*, 844 F.3d at 566–67).) The only question before us is whether Morrison and Gaines's seizures were nevertheless reasonable because Plaintiffs' dogs were "contraband" and therefore unprotected by the Fourth Amendment.

"It is settled in [Michigan] that dogs have value, and are the property of the owner as much as any other animal which one may have or keep." *Ten Hopen v. Walker*, 55 N.W. 657, 658 (Mich.

1893).[4] The district court recognized this principle but found that because the Michigan Dog Law of 1919 and Detroit City Code § 6-2-1 criminalize the possession of unlicensed dogs, the failure to license a dog forfeits any property interest in that animal. This reading is unsupported by the plain language of either provision.

Whether something is contraband—strictly unlawful to possess or produce—is defined by positive law. *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016). The Michigan Dog Law, Mich. Comp. Laws § 287.261 *et seq.*, makes it "unlawful for any person to own any dog 6 months old or over, unless the dog is licensed." Mich. Comp. Laws § 287.262. Prior to 2014, the law authorized a county sheriff to "locate and kill, or caused to be killed, all such unlicensed dogs." But that authorization was eliminated by Public Act 32 of 2014, and the law now requires the county prosecutor, "[u]pon receipt of the name of an owner of an unlicensed dog from the county treasurer," to bring proceedings against the owner. Mich. Comp. Laws § 287.277. The law provides the process for notifying owners of unlicensed dogs of the proceedings:

> (1) A district court magistrate or the district or common pleas court shall issue a summons[5] . . . to show cause why a dog should not be killed, upon a sworn complaint that any of the following exist:
>
> (a) After January 10 and before June 15 in each year a dog over 6 months old is running at large unaccompanied by its owner or is engaged in lawful hunting and is not under the reasonable control of its owner without a license attached to the collar of the dog.

---

[4] Although the dissent correctly observes that *Ten Hopen* was decided before the Dog Law of 1919 was enacted, Michigan courts have nevertheless continued to apply it. *See, e.g*., *Koester v. VCA Animal Hosp.*, 624 N.W.2d 209, 211 (Mich. Ct. App. 2000) ("Pets have long been considered personal property in Michigan jurisprudence." (citing *Ten Hopen*, 55 N.W. at 657)).

[5] The summons shall be "similar to the summons provided for" in the case of a dog that damages livestock, which provides: "The summons may be served anyplace within the county in which the damage occurred, and shall be made returnable not less than 2 nor more than 6 days from the date stated in the summons and shall be served at least 2 days before the time of appearance mentioned in the summons." Mich. Comp. Laws § 287.280.

(b) A dog, licensed or unlicensed, has destroyed property or habitually causes damage by trespassing on the property of a person who is not the owner.

(c) A dog, licensed or unlicensed, has attacked or bitten a person.

(d) A dog has shown vicious habits or has molested a person when lawfully on the public highway.

(e) A dog duly licensed and wearing a license tag has run at large contrary to this act.

Mich. Comp. Laws § 287.286a.  In the absence of the above criteria, the law does not authorize killing the dog, but penalizes the owner:

Any person or police officer, violating or failing or refusing to comply with any of the provisions of this act shall be guilty of a misdemeanor and upon conviction shall pay a fine not less than $10.00 nor more than $100.00, or shall be imprisoned in the county jail for not exceeding 3 months, or both such fine and imprisonment.

Mich. Comp. Laws § 287.286.

Similarly, under Detroit City Code § 6–2–1, it is "unlawful for any person to own, harbor, keep, or shelter a dog more than four (4) months of age within the City without purchasing a license for the dog."  The ordinance authorizes the Detroit Animal Control Division to enforce the provision "consistent with the Michigan Dog Law of 1919." *Id.*  It is clear from these provisions that owners of unlicensed dogs are entitled to process prior to seizure as provided by the Michigan Dog Law, and therefore retain a property interest in the dogs.  The district court erred in finding otherwise.

By guaranteeing process to dog owners before their unlicensed dogs are killed, Michigan law makes clear that the owners retain a possessory interest in their dogs.  This is particularly so in the context of everyday property that is not inherently illegal, such as some drugs, but instead is subject to jurisdiction-specific licensing or registration requirements, such as cars or boats or

guns. Just as the police cannot destroy every unlicensed car or gun on the spot, they cannot kill every unlicensed dog on the spot.

Further, even assuming Plaintiffs' dogs were contraband, the result here would be the same. The district court held that the Fourth Amendment simply does not apply to protect contraband. That is wrong—and it has been wrong for at least forty years. In cases involving contraband, the Supreme Court has continued to ask whether a seizure was reasonable under the Fourth Amendment: A warrantless seizure of contraband is not reasonable if it was not "immediately apparent" to an officer that the item was contraband. *Horton v. California*, 496 U.S. 128, 136–37 (1990); *see also Arizona v. Hicks*, 480 U.S. 321, 326–28 (1987); *Payton v. New York*, 445 U.S. 573, 587 (1980); *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971).[6]

Just like it applied to the stolen stereo equipment in *Hicks*, the Fourth Amendment applies to the unlicensed dogs here. And just like the seizure in *Hicks*, the officers' seizures here were unreasonable. This case does not involve a five-year-old holding an open beer can; the officers here could not look at the dogs and know whether they were licensed. Further, there is evidence that the officers did not see each dog before shooting it.

Although Michigan law required the dogs to wear license tags, Mich. Comp. Laws § 287.267, the Officers could not tell that the dogs were unlicensed simply because they were not wearing tags. Dogs can be licensed but not wearing a license tag. The dogs could also have been

---

[6] The dissent believes these cases are inapposite because they involve unreasonable searches, not seizures, and the remedy sought was suppression, not damages. We believe these distinctions are immaterial. The dissent cites no case that distinguishes between searches and seizures for these purposes. Rather, the Supreme Court in *Hicks* refused to make such a distinction. 480 U.S. at 328 ("Although the interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures neither the one nor the other is of inferior worth or necessarily requires only lesser protection. We have not elsewhere drawn a categorical distinction between the two insofar as concerns the degree of justification needed to establish the reasonableness of police action, and we see no reason for a distinction in the particular circumstances before us here." (citation omitted)). Second, given the doctrine of qualified immunity, we see no basis to change our analysis of a constitutional violation based on the remedy sought. Indeed, § 1983 authorizes monetary compensation for constitutional violations.

under 6 months old and therefore not subject to the state licensing requirement. Mich. Comp. Laws § 287.262. Or the dogs could have been less than 4 months old or in Detroit for 30 days or less and thus not subject to the municipal licensing requirements. Detroit City Code §§ 6–2–1, 6–2–2. Under these circumstances, it would not be immediately apparent to the police officers that the dogs needed to be licensed and were not.

As the district court observed, "the officers did not shoot the dogs because they were unlicensed. Rather, the officers . . . were not even aware that the dogs were unlicensed." (R. 27 at PID 945.) Without that, the plain view exception does not apply to justify warrantless seizures. We emphasize, however, that even if the Officers had knowledge that the dogs were unlicensed, they still would not have been authorized to shoot them on the basis that they were contraband.

Based on Defendants' concession that issues of material fact precluded summary judgment on Plaintiffs' § 1983 and state-law conversion claims regarding two of the dogs, we **REVERSE** the judgment of the district court only as to Officers Morrison and Gaines and **REMAND** the case for further proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Circuit Judge, dissenting.** The majority concludes that "[i]t is clear" under Michigan state law "that owners of unlicensed dogs . . . retain a property interest in the dogs." Maj. Op., at 8. But Michigan state law on this question is not nearly so clear as the majority claims. The district court analyzed Michigan state law and reached the opposite conclusion, and the majority has not shown why the district court was wrong as a matter of Michigan state law. And there are good reasons to think that the district court may have been correct. In any event, existing law at the time that the police officers killed the Plaintiffs' dogs did not establish beyond debate that the officers' conduct infringed on the Plaintiffs' Fourth Amendment rights, and so the majority errs by not affording the officers qualified immunity.

The majority also concludes that "even assuming Plaintiffs' dogs were contraband, the result here would be the same." *Id.* But the majority's constitutional analysis misinterprets the Supreme Court's Fourth Amendment cases and threatens to extend sweeping monetary liability to officers who seize contraband during searches and to the municipalities that employ them.

For these reasons, I respectfully dissent. But I echo the district court's recognition that this conclusion "may not sit well with dog owners and animal lovers in general." I am a long-time dog owner myself, and this conclusion does not sit well with me either. But my review of Michigan state law and the Supreme Court's qualified-immunity and Fourth Amendment cases makes me unable to join the majority's opinion.

## I.

### A.

"There is not a lot of law about the Fourth Amendment and dogs." *Hardrick v. City of Detroit*, 876 F.3d 238, 246 (6th Cir. 2017) (Sutton, J.). It is clear, generally speaking, that "a dog is property." *Id.* (quoting *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016)).

So, to the extent that a dog is property, "the killing of a dog constitutes a 'seizure' within the meaning of the Fourth Amendment." *Brown*, 844 F.3d at 566. This is because the killing of a dog constitutes a "meaningful interference with an individual's possessory interests" in his dog. *Id.* But we have never before answered the question of whether a person retains a legitimate possessory interest in an unlicensed or untagged dog where state law makes the ownership or possession of such a dog a criminal offense. No other circuit has addressed this question either, so there is even less law about the Fourth Amendment and unlicensed or untagged dogs.

The district court case concluded that owners of unlicensed dogs in Michigan do not retain a legitimate possessory interest in their unlicensed dogs because Michigan state law makes the ownership or possession of an unlicensed dog a criminal offense. Although Michigan state law is not clear, here are some reasons to think that the district court may have been correct.

As the majority recognizes, we must look to Michigan state law to determine the property status of unlicensed or untagged dogs in Michigan. *See* Maj. Op., at 7. The majority quotes an 1893 Michigan Supreme Court case which states that dogs in Michigan "have value, and are the property of the owner." *Id.* (quoting *Ten Hopen v. Walker*, 55 N.W. 657, 658 (Mich. 1893)). But *Ten Hopen* is not the last word on this question. Dogs "hold[] their lives at the will of the legislature," *Bugai v. Rickert*, 242 N.W. 774, 775 (Mich. 1932) (quoting *Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 702 (1897)), and the Michigan legislature enacted its Dog Law of 1919 more than twenty years after *Ten Hopen* was decided. So it is the Dog Law of 1919 and the Michigan cases that follow it, and not the Michigan cases that precede it, to which we must turn to determine the property status of unlicensed or untagged dogs in Michigan.[1] *Cf. Sentell*, 166 U.S.

---

[1] The district court analyzed this question under both the Michigan Dog Law of 1919 and the Detroit City Code. I focus here on the Dog Law of 1919, but my analysis of the Detroit City Code would be similar.

at 704 ("Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.").

Looking to the Michigan cases that follow the enactment of the Dog Law of 1919, we find that there is in Michigan a property interest in dogs, "but of an imperfect or qualified nature." *Bugai*, 242 N.W. at 775 (citing *Finley v. Barker*, 189 N.W. 197, 199 (Mich. 1922)); *see People v. Yeo*, 302 N.W.2d 883, 885–86 (Mich. Ct. App. 1981) ("The police power of the state has been used to regulate and control property in dogs to a greater extent than property in any other class of domestic animals. It is a peculiar kind of property.") (quoting *State v. Mueller*, 265 N.W. 103, 106 (Wis. 1936)). Dogs in Michigan may therefore "be subjected to peculiar and drastic police regulations by the state without depriving their owner of any federal right.'" *Bugai*, 242 N.W. at 775 (quoting *Nicchia v. New York*, 254 U.S. 228, 230 (1920)).

The Dog Law of 1919 makes owning or possessing an unlicensed or untagged dog a criminal offense which is punishable by up to three months in jail or a fine, or both. *See* Mich. Comp. Laws §§ 287.261(2)(c), 287.262, 287.286. In other contexts, at least, we have found items to be contraband where state law prohibits the possession of that item and attaches criminal penalties thereto. *See, e.g.*, *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) ("marijuana is contraband because its possession and production is prohibited under federal law and the criminal laws of most states") (citing *Black's Law Dictionary* 365 (9th ed. 2009) (contraband is "[g]oods that are unlawful to . . . possess")). And persons have no constitutionally protected property interest in possessing contraband. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("any interest in possessing contraband cannot be deemed 'legitimate'" (citation omitted)); *United States v. Droganes*, 728 F.3d 580, 592 (6th Cir. 2013) ("Droganes lacks a sufficient property

interest in the [illegal unlicensed] display fireworks . . . because those items are contraband, and individuals have no property interest in contraband."); *accord United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983) (where federal law prohibited possessing an unregistered submachine gun, the warrantless seizure of an unregistered submachine gun "invaded no interest that the Fourth Amendment protects" because defendant "did not have a lawful property interest in the unregistered gun").

Now, it is true that the Dog Law of 1919 does not contain as clear a statement that unlicensed or untagged dogs are contraband as exists elsewhere in Michigan state law. *See* Mich. Comp. Laws § 436.1235 ("A property right does not exist in any alcoholic liquor had, kept, transported, or possessed contrary to law . . . , and all such are hereby declared contraband and forfeited to the state and shall be seized."). But such a clear statement is not necessary. "[M]arijuana is contraband," *see Church*, 823 F.3d at 355, and Michigan's provision prohibiting possessing marijuana is more like the Michigan provisions prohibiting owning or possessing unlicensed or untagged dogs than it is like the Michigan provisions prohibiting possessing illegal liquor, *see* Mich. Comp. Laws §§ 333.7403 (prohibiting the knowing or intentional possession of controlled substances), 333.7212 (categorizing marijuana as a controlled substance).

Other provisions of the Dog Law of 1919 show that Michigan state law draws a line between licensed dogs and unlicensed dogs. These provisions confirm that licensed dogs in Michigan are property in which a person has a legitimate possessory interest protected by state law, but seem to indicate that unlicensed dogs in Michigan are either not property in which a person has a legitimate possessory interest protected by state law or are property in which a person has some kind of inferior property interest. The owner of a licensed dog may seek monetary damages from a police officer or other person who kills that dog, *see id.* § 287.287, but there is no indication

that owners of unlicensed dogs may seek such damages. *Cf. Finley*, 189 N.W. at 201 ("A presumption of value attends a licensed dog."). Persons who are not police officers may not "kill or injure or attempt to kill or injure any dog which bears a license tag for the current year," except in limited circumstances. *See* Mich. Comp. Laws § 287.279; *cf. Finley*, 189 N.W. at 201 (describing dog licenses in Michigan as "entitling [] dog[s] to live" and "protect[ing] their lives"). Persons also may not "steal, or confine and secrete any dog licensed under this act," except in limited circumstances. *See* Mich. Comp. Laws § 287.286b; *see also id.* § 287.308. But there are no provisions making it illegal to kill, steal, or confine and secrete unlicensed dogs. And any "dog required to be licensed under this act that is unlicensed is a public nuisance," and county prosecutors "shall commence proceedings against the owner of the dog as required by the act." *Id.* § 287.277.

Only one provision of the Dog Law of 1919 might undercut this conclusion, and it is this provision on which the majority relies. This provision authorizes Michigan authorities to kill certain licensed or unlicensed dogs, but only after following a prescribed legal process. *See id.* § 287.286a. To the majority, this provision makes it "clear" that "owners of unlicensed dogs are entitled to process prior to seizure . . . , and therefore retain a property interest in the dogs." Maj. Op., at 9. But this provision does not purport to protect all unlicensed dogs; rather, it applies to several categories of dogs, some licensed, some unlicensed, and some whether licensed or unlicensed. *See, e.g.*, Mich. Comp. Laws § 287.286a(1)(e) ("[a] dog duly licensed and wearing a licensed tag [that] has run at large contrary to this act"); *id.* § 287.286a(1)(c) ("[a] dog, licensed or unlicensed, [that] has attacked or bitten a person"); *see also Finley*, 189 N.W. at 201 ("The owner who has complied with the law, paid for and obtained a license entitling his dog to live, is at least entitled to notice and a hearing before the dog is killed."). Still, even if this provision protects all

unlicensed dogs, the Dog Law of 1919 does not authorize persons to seek monetary damages from a police officer who kills an unlicensed dog without following the prescribed legal process. *See* Mich. Comp. Laws § 287.287. The only remedy the Dog Law of 1919 provides for a police officer's failure to comply with any of its provisions, other than the illegal killing of a licensed dog, is potential criminal liability for the police officer. *See id.* §§ 287.286, 287.287.

For all of these reasons, I disagree with the majority that it is "clear" under Michigan state law that owners of unlicensed dogs "retain a property interest in the dogs."

**B.**

Although it is not "clear" under Michigan state law that owners of unlicensed dogs "retain a property interest in the dogs," I concede that it also may not be "clear" under Michigan state law that unlicensed or untagged dogs are contraband in which a person retains no legitimate possessory interest whatsoever. But we need not decide this question. This lack of clarity in Michigan state law means that existing law at the time that the officers killed the Plaintiffs' dogs did not establish beyond debate that the officers' conduct impinged on the Plaintiffs' Fourth Amendment rights. The majority therefore errs by not affording the officers qualified immunity.

Under the Supreme Court's precedents, police officers are entitled to qualified immunity from claims under 42 U.S.C. § 1983 unless they violate a federal statutory or constitutional right *and* unless the unlawfulness of their conduct was "clearly established at the time." *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). "'Clearly established' means that, at the time of the officer[s'] conduct, the law was sufficiently clear that every reasonable official would understand what he was doing is unlawful." *Id.* (internal quotation marks and citation omitted). "In other words, existing law must have placed the constitutionality of the officer[s'] conduct beyond debate." *Id.* (internal quotation marks and citation omitted). This is a

"demanding standard" that "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citation omitted).

It is not clear that the first prong of qualified immunity is satisfied here, but we need not decide that question in order to afford the officers qualified immunity, since the second prong certainly is satisfied. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Existing law at the time that the officers killed the Plaintiffs' unlicensed dogs did not establish beyond debate that a person retains a legitimate possessory interest in his unlicensed or untagged dog where state law makes the ownership or possession of such a dog a criminal offense. The panel majority has not "identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation," *see Wesby*, 138 S. Ct. at 591, in circumstances where police officers killed unlicensed or untagged dogs in a state where owning or possessing an unlicensed or untagged dog is a criminal offense. Every reasonable official therefore would not have known that the Fourth Amendment was implicated in circumstances like these, where the Plaintiffs have neither alleged that their dogs were licensed nor alleged any facts from which we may infer that there was any way for the officers to know that the Plaintiffs' dogs were anything other than unlicensed, such as the presence of collars with license tags.

The majority states that the "officers here could not look at the dogs and know whether they were licensed." Maj. Op., at 9. But the officers here could look at the dogs and know whether they were wearing collars with license tags, as is specifically required by Michigan state law. *See* Mich. Comp. Laws § 287.267. And the absence of collars with license tags alone made the Plaintiffs' dogs illegal to own or possess under Michigan state law. *See id.* § 287.262 (making it "unlawful for any person to own . . . any dog 6 months old or over that does not at all times wear a collar with a tag . . . .").

The only thing that existing law at the time established beyond debate was that the Fourth Amendment protected licensed dogs from unreasonable seizures, *see Brown*, 844 F.3d at 566 (finding that this was clearly established in 2013), but the clearly-established standard requires a "high degree of specificity," *Wesby*, 138 S. Ct. at 590, and this specificity is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). *Brown* is therefore not sufficient to have established beyond debate that the killing of an unlicensed or untagged dog implicated the Fourth Amendment's prohibitions.

Because existing law at the time that the officers killed the Plaintiffs' dogs did not establish beyond debate that the officers' conduct infringed on the Plaintiffs' Fourth Amendment rights, the majority errs by not affording qualified immunity to the officers.

## II.

I must also dissent from the majority's conclusion that, "even assuming Plaintiffs' dogs were contraband, the result here would be the same." Maj. Op., at 9. There is a significant problem with the majority's constitutional analysis which could have sweeping ramifications.

In each Supreme Court case the majority cites, the alleged constitutional harm was an unreasonable *search* under the Fourth Amendment and in each case the remedy sought was *suppression* of the allegedly illegally obtained evidence. *See Horton v. California*, 496 U.S. 128, 141–42 (1990) (rejecting an "inadvertence" requirement and affirming the denial of a motion to suppress evidence found in plain view during a search pursuant to a valid search warrant); *Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (affirming the suppression of evidence where police officers conducted an additional search unjustified by the exigent circumstances that validated entry into

the home); *Payton v. New York*, 445 U.S. 573, 577–82 (1980) (reversing the denial of four motions to suppress evidence found in plain view during warrantless entries into homes to make felony arrests); *Coolidge v. New Hampshire*, 403 U.S. 443, 453–54, 472 (1971) (reversing in a case "not . . . involving contraband" the denial of a motion to suppress evidence found during a seizure and search pursuant to an invalid warrant). None of these cases involves plaintiffs seeking monetary damages for the seizure of contraband during a search. For example, in *Hicks*, the Fourth Amendment's prohibition of unreasonable *searches* required the suppression of the contraband found as a result of an illegal search. But nothing in the Fourth Amendment required the police officers to pay James Thomas Hicks the value of the stolen stereos that the officers later seized. *See generally Hicks*, 480 U.S. 324–29.

The majority's failure to cite a single Supreme Court case authorizing similar 42 U.S.C. § 1983 lawsuits seeking to recover monetary damages for contraband seized during a search is telling, but is not surprising. Police officers regularly seize contraband during searches, much of it quite valuable. The majority's reasoning would authorize lawsuits seeking damages for the seizure of, among other things, illegal drugs and illegal firearms. *See generally, e.g.*, *Church*, 823 F.3d at 354 (police seized marijuana, pills, and a firearm from a convicted felon); *Janik*, 723 F.2d at 541 (police seized unlicensed submachine gun and sawed-off shotgun). Nothing in the Supreme Court cases cited by the majority requires, much less supports, such a result, and we should be careful not to mangle the Supreme Court's Fourth Amendment cases to create such sweeping monetary liability for police officers and the municipalities that employ them.

**III.**

For the foregoing reasons, I respectfully dissent.